The subject matter is not quite as scintillating, I reckon. I was going to say, we can resolve this real quick. Okay, you win. Well, it might have taken a little bit longer to go to the restroom. I say it's short, but I guess it's bigger. You could have let your head your cup of coffee. I know. Mr. Bailiff, go up there. I think I hear a lady approaching in the bathrooms there. Maybe they're coming around. All right, we're back in session. No worries. Sometimes when we say short, short tends to be longer. But in this case, we were a little quicker coming back. All right, call up this last case for argument, SEC v. Valdez. Mr. Hoffner, you're up. May it please the Court, David Hoffner for Appellant Damian Valdez. In a case where investors got all their money back and the Court concluded that no disgorgement was warranted for Mr. Valdez, the District Court nonetheless imposed a draconian $3.8 million civil penalty against Mr. Valdez. The civil penalty was calculated pursuant to a methodology that violated the plain terms of the underlying authorization statutes for two distinct reasons. Both statutes, under the Securities Act of 1933 and the Securities Exchange Act of 1934, with respect to imposition of a third-tier civil penalty, set a maximum civil penalty with respect to two prongs, and only the second prong is relevant here. That prong is that the maximum civil penalty shall not exceed the gross amount of pecuniary gain to such defendant as a result of the violation. In the first instance, this Court needs to determine what does to such defendant mean? Now, two courts of appeals have already looked at this issue. The Court of Appeals for the Second Circuit in the SEC v. Pentagon Capital case and the Court of Appeals for the D.C. Circuit in the Milan Group case, albeit in dicta with respect to the D.C. Circuit, have held that the language to such defendant means that the Court is obliged to conduct an analysis of the pecuniary gain to that specific defendant on whom the civil penalty is being imposed. But that's not what happened here. Perhaps because there was no trial in this case and the Court relied solely on findings of fact based on a preliminary injunction hearing, the only fact finding in the record with respect to what the Court deemed to be pecuniary gain was the net amount that the three defendants, two corporations, and Mr. Valdez had received from investors as the date of the appointment by the Court of a receiver. That's effectively the same number that the SEC sought disgorgement on. And Mr. Valdez, in response to the SEC's motion, argued it was woefully premature at that stage to conduct an analysis as to disgorgement and civil penalties because the receiver was still doing his job. He had collected millions of dollars that still had to be distributed to investors and he had made subsequent distributions after his appointment. The Court recognized with respect to disgorgement that that was indeed the case, that it was premature because we didn't yet know what the investors' out-of-pocket losses were. So the Court imposed a very modest disgorgement and then said, well, we'll revisit this once the receiver is done with his work. And ultimately, subsequently, the receiver made a final distribution and the Court recognized that there were no out-of-pocket investor losses and therefore no disgorgement was warranted with respect to Mr. Valdez. But with respect to the civil penalty, the Court did not give any attention to the receiver's efforts. It merely took a number in the record from the preliminary injunction hearing that was the dollar amount of net investor payments to the defendants as of the date of the receiver's appointment. It ignored the fact that subsequent to the receiver's appointment, the receiver had returned to investors more than $3.5 million, $3.1 million of which was the liquidation of particular securities that had been purchased by the defendants and held for the investors at all times in trust by U.S. Bank. The Court didn't do any pecuniary gain analysis as required by the statute. It effectively just took the disgorgement number that would have been appropriate if the receiver hadn't ever been appointed and no monies had ever been returned to the investors. So perhaps the Court got confused between disgorgement and civil penalty, but in any event it recognized the premature nature of the motion with respect to disgorgement but went ahead and just took that somewhat arbitrary number of $3.8 million and applied it to the civil penalty and imposed that on Mr. Valdez. That's a civil penalty that, frankly, Mr. Valdez will be saddled with likely for the rest of his life. The SEC with respect toóso on the first pointó If the purpose is to punish him, then how are we punishing him if we don't saddle him with some sort of debt? Oh, absolutely a civil penalty is warranted here, but what I'm asking the Court to oblige the District Court to do is to hold a hearing to determine, which it never did and which wasn't in the record, again, perhaps because we relied solely on the preliminary injunction hearing, what was Mr. Valdez's pecuniary gain? What money did he receive? He got salary, he had some expenses paid, he may have received some fees, but that's the analysis that needs to be done as to what his pecuniary gain was, an analysis that the District Court never undertook. Now, I'm not saying that there might not be monies that were received by the evolution entities, the two defendants, the two corporative defendants, that might not, after a factual showing, could be attributed to him. Some courts have said there could be some overlap, but what the Second Circuit in Pentagon Capital said and what the D.C. Circuit in Milan Group basically held was that you can't just take an aggregate number, pecuniary gain to all the defendants, and impose that on a single defendant. But the penalty wasn't imposed on the two corporate defendants. That's correct. And so that's one of the reasons why the SEC has argued Pentagon Capital doesn't apply here. In Pentagon Capital, there were two defendants and an individual, just like here, and the court imposed joint and several liability as to the corporation and the individuals. And so the SEC and the Second Circuit said that's inappropriate. You can't do that. You have to have a particular finding as to the pecuniary gain for two such defendants. It said it's clear, the statute is clear on its face, two such defendants means that defendant upon whom the penalty is being imposed. It doesn't say two such defendants and corporate entities that they control. One could analyze the monies received by the corporate entities and then subsequently conclude monies thereafter then went to the individual defendant or somehow he benefited from them. It's the same pocket. There weren't separate pockets for the individuals, for the corporate defendants. Well, there were different pockets. There were two investment vehicles. It all went to the individual. No, it did not, Your Honor, and there's no finding in the record at all that it went to the individual at all. The only findings of fact with respect to Mr. Valdez in the record are that he received some expenses paid that the court found an issue, a foreign trip and some rent payments on an apartment. But basically all this money was used to purchase securities that were held for investors at all times. Under the control of the individual. Under the control, the entities were controlled by the individual. That's correct. But the point is ultimately is it still requires an independent analysis of that pecuniary gain to such defendant. It's not, you just don't look through the corporate entity. You'd have to show, the government has to have some kind of analysis, some kind of showing, and this is what the district court in the SEC Huff in Florida found. You have to show gain causation. You have to show that the individual defendant benefited from the pecuniary gain. Can you show us where in the record you asked the district court to make particular findings that weren't made? Well, what happened here, it's somewhat unusual, and perhaps this is why we're in the, this is the problem, is that there was a preliminary injunction hearing. The court ruled on that hearing and issued an opinion and issued injunctive relief and made certain findings of fact. Thereafter, defendants counsel sought to withdraw from the case. They were granted leave to withdraw. And then the parties all stipulated, before I was involved, that they would be, they would basically move to final judgment based on the record as it existed then from the preliminary injunction hearing. But the court, perhaps not anticipating that that would be the likely, that's the procedural way this would go, or the parties not anticipating it or not thinking ahead clearly enough, never endeavored to establish Mr. Valdez's pecuniary gain, never endeavored to establish how he benefited. Well, I guess I'm wondering, like, how can we or should we fault the district court for not making findings the district court wasn't asked to make? Y'all decided just go with this record. And instead convened a hearing and created a record and all that. That's the SEC's burden. This is their burden of proving compliance with this statute. They stipulated, if they had concluded, if they had looked ahead and said, we have certain findings that we've got to establish to impose a civil penalty, then they should have established that at the hearing, or they should have not have stipulated that these are the facts we're going to rely on. They should then have requested a subsequent hearing with respect to the civil penalty, with respect to the final judgment. The problem isn't the lack of findings. You're saying there's a lack of evidence to support findings. At this point, there could be at a subsequent hearing, the SEC could establish what particular pecuniary gain Mr. Valdez benefited from. So you want us, your remedy that you seek, if you hit a home run here, would be that we would vacate the penalty and send it back for the district court to hold a hearing, and what guidelines would we give the district court on what's supposed to happen at this hearing and what findings the district court needs to make? So that gets to the second point. So under the statute, the court has to determine specifically Mr. Valdez's pecuniary gain. The second piece of this, and I'm asking the court to provide, and why this civil penalty was improper under the statute, and why I would hope that if it finds that the hearing needs to be held, offer some guidance as to this, is what does a pecuniary gain mean in this context? And the SEC basically just took a net number as of the receiver's appointment. It ignored the fact that there was $3.1 million in securities held for investors, subsequently liquidated at the request of the receiver, and then returned to the investors. You didn't rely on that argument below. With respect to the 3.1? Yeah. Your Honor, we argued, first of all, the primary argument I'm going to face with this motion was, this application is woefully premature. You've appointed a receiver judge. The receiver is collecting millions of dollars. We need to ascertain what the impact of the receiver's efforts are at the end of the day before we can ascertain what the disgorgement is in the court agreed and what the civil penalty is in the court that the court disagreed. It's plain under the statute. So we cited the statute to the court that it requires an establishment of the gross amount of pecuniary gain to such defendant. With respect to the $3.1 million, it's a pure question of law. And under this court's jurisprudence, that is something that can be addressed by this court, notwithstanding the failure to raise it below. But under the circumstances here, where the court basically sort of blindsided the defendants and acknowledged that it was premature not to go to final judgment with respect to everything. The receiver had already amassed millions of dollars, liquidated these securities, had third-party claims outstanding, that it was premature to do it. But then, in that circumstance, to have the court find that the disgorgement wasn't warranted, that there would be no disgorgement required because all the money had been returned, but nonetheless, take that disgorgement number as the receiver date and impose it as a civil penalty, no one could have anticipated that, Your Honor. It would be really manifestly unfair under that circumstance for that to be deemed a waiver. And under this court's jurisprudence, it has the right, it's a pure question of law, what is the pecuniary gain here? The court didn't look at this defendant's pecuniary gain at all. It did no such analysis. The analysis was conducted at the preliminary injunction hearing, and that's perhaps why we're faced with that problem here. But the SEC, it's their burden. And if they had understood what their obligations were to meet these final, the imposition of a penalty, they should not have stipulated that they were going to rest on the facts that had previously been determined. They should have requested an additional hearing, and then we could have had a full adjudication of findings of fact as to what Mr. Valdez personally benefited from. And again, I'm not trying to, if there were monies received by the evolution entities that he controlled, that he personally benefited from, that could be a component piece of the civil penalty calculation. But there are no other cases where you just take a lump sum of investment money sent to the investment entities and that's deemed a pecuniary gain to the individual. It's undisputed, $3 million was ultimately liquidated as a result of securities that were held, purchased for investors and held in trust by U.S. Bank. That money never went to Mr. Valdez. Mr. Valdez never was alleged to have embezzled or absconded with any money. The only allegations in this case was that he misrepresented the risk nature of the profile of the securities. That's it. He was never accused of taking any investor money. There were some allegations that some expenses, some very de minimis expenses, were improper. But if the court finds that, then that could be part of the civil penalty. But you can't just impose the entire amount of investor money, which never was to his benefit, as a civil penalty. All right, I'm going to hold you at that point. You've reserved time for rebuttal. Let me see what SEC has in counter, and you'll be back up on rebuttal. Ms. Prince? May it please the Court, Sarah Prince for the Securities and Exchange Commission. I will go back and clarify a little bit what happened below. First of all, at the preliminary injunction hearing, the parties agreed before the hearing began that that hearing would also lead to a ruling on the permanent injunction. So it wasn't a question of preliminary injunction hearing only that suddenly became a permanent injunction hearing without anyone's notice. That's in the Court's order, the record on page 874. So then getting back to the substance of the arguments, beginning with his joint and several liability argument, that argument was waived, and it also fails on the merits because the court did not impose joint and several liability or anything equivalent. It imposed penalties only on Valdez and only in the amount of his pecuniary gain. Now, Valdez didn't challenge below and doesn't dispute now the factual findings that show that the entities and Valdez were essentially functioned as one unit, such that the entity's gain was Valdez's gain. He says now that the Court should have done an independent analysis, but, in fact, the evidence and the Court's findings were already there, just not apparently in the form that the defendant would like. But as Your Honors have noticed, that is because the defendant didn't ask for such findings below. As to the Court's findings, first and most importantly, the Court found that Valdez only controlled the entities, which was never disputed. Second, as further evidence that he treated the entities' gains as his own, he used those funds regularly for personal expenditures. And third, the Court found that Valdez and his entities' conduct was inseparable. So on that undisputed record, it was well within the District Court's discretion to penalize Valdez for gains that he did receive through his entities. And Pentagon capital management isn't to the contrary because, in that case, the Second Circuit reversed a penalty that had been imposed jointly and severally and, therefore, was based merely on the fact that the defendants had collaborated, not on the fact that any defendant had gained anything through his entities. Nor does Valdez cite any other contrary authority on that point. As to his second argument, that Valdez should have gotten credit in his penalty for the value of the loan strips, that argument was also waived again, and it fails because it's completely contradicted by the undisputed record, which is clear. But he's kind of, he's making a slightly more subtle argument here than that, and that is that given that even at the time he was arrested, so you could say, well, let's use that number because thereafter, you know, we made him be good, and so that can't really count in his favor. He's saying even at that moment, there's this $3 million sitting in U.S. Bank and Trust for these people. Why does he not get the benefit of that, even if we otherwise kind of tag him with the wrong as of the point of arrest or the point of the receiver's appointment or whatever? Understood. That might be the case if, in fact, the strips had been held for the benefit of the investors. But the record shows that that was not the case, that, in fact, they were held for the benefit of Valdez and that he controlled them at all times. Now, he points to the fact that U.S. Bank, as a trustee, did hold on to the certificates that evidenced the strips, but he hasn't actually argued, because he can't, that that trustee was anything but nominal because, in fact, it was dictated by the agreements governing the notes that the trustee would have no discretion or responsibility over the management of the loans and that Evolution would maintain all of that. So you're saying this is that what was held is the equivalent of a bank account, you know, the bank account of Damien Valdez sitting at U.S. Bank and him saying, well, I was holding that. That was for all these people, of course, the day he's caught. You're saying the district court doesn't have to credit that kind of argument, even if it had been made, which it kind of wasn't. But let's assume it was. Exactly. And, in fact, there's evidence, undisputed evidence below that that characterization is incorrect because, first of all, it's undisputed that all of the cash flow from the notes went to Evolution, which kept it for its own accounts and not setting aside anything for the investors. And it was Valdez's decision to treat all of that cash as profits and management fees rather than setting it aside. And, of course, the terms of the agreements that give him that control are also undisputed. But the $3 million at U.S. Bank you're saying, I understand he's taking the proceeds for himself, but how is he treating the $3 million that's in U.S. Bank or that they're holding the title to as his? Well, the $3.1 million didn't come until after the receiver had sold those strips. So what the $3.1 million also gives him credit for is, of course, the effort of the receiver to get value out of the strips that he was, again, treating as his own. So it wasn't cash in U.S. Bank. No, I understand that. But still, if we're saying, you know, if the district court, let's come at it this way, if the district court had accepted that these strips were being held in trust and were not being used by Valdez, then wouldn't the court need to have netted these out? If these had been held for the benefit of the investors, that would be a much different question, yes. I think, for instance, if the investors had actually gotten anything in value for their investment, then, yes, that value would have had to be netted out. But I think the facts are undisputed here that that's not what happened. So you're saying but for the interruption of this scheme by the SEC coming in, he would have eventually used up all of that for himself. That's really the point about the gain. Yes, and that inference is supported by the district court's finding at the injunction stage when it concluded that this was never going to succeed without further, essentially as in a Ponzi scheme, the court held that this was essentially a Ponzi scheme because without further investments to pay back the original investors, Valdez was going to keep on paying himself and his entities excessive fees and not saving any money for them. But, I mean, it is interesting that everybody got, it sounds like, 100 cents on the dollar. There's nothing left to disgorge. Almost, almost. So that's pretty good for Valdez. It's lucky both for the investors and for Valdez because that means that he doesn't, he didn't have to go into his pocket to pay any disgorgement because his entities essentially paid it for him through the receiver. So he was lucky in both senses. And that's because, again, the scheme was caught early on. But, again, certainly with regards to the penalty, which is based, which is intended to punish, it certainly should not be taking into account what the investors eventually got back. And briefly to just address the idea that because he received credit for his disgorgement, he should also receive similar credit for his penalty. That ignores the important difference between the two remedies, which both, of course, start with the defendant's ill-gotten gains. But disgorgement is intended only to prevent unjust enrichment, such that the wrongdoer must only give back his ill-gotten gains, where, of course, the penalty is intended to go further, to punish, and to create additional financial disincentives. So while the receivership may have achieved disgorgement purposes, it certainly didn't achieve the penalty's purpose. And if the Court has no further questions. Thank you. All right. We're back to you, Ms. DeHoffner. First off, Judge, this was not a criminal case. There was never any criminal prosecution of Mr. Valdez. It was purely an SEC. Did I say something? You said arrested. Oh, arrested. I see what you're saying. Found. Okay. Yes. But this is totally misrepresenting what happened here. There was no finding that had the SEC not gotten involved and had a receiver appointed that the 3.1, the I.O. strips held at U.S. Bank, would have landed in Mr. Valdez's pocket. Wasn't that the way the scheme was working? Absolutely not. Investors were getting their money back. The issue was there were two investment vehicles, and at some point the allegation was he used proceeds from investors to pay back some investors in the other fund, and basically it was so commingling. This is not a Ponzi scheme in the sense. This is no Madoff. Why do you agree that he's entitled to a level three penalty if all he's doing is just running a regular investment thing that may or may not make money? I mean, you're making it sound like he didn't do anything wrong. No, no. The Court found he shouldn't get any penalty. No, absolutely. The Court found that he had misrepresented the risk profile of the investment. He was saying these were SBA. The argument was that they were SBA securities, small business administration securities, guaranteed by the U.S. government. What he was purchasing in part were IO strips, a component piece of an SBA loan that only a portion of which was guaranteed by the government. That was the crux of the misrepresentation that the Court found. So it's not in any way the case. This is not a person. This is not a Madoff who was engaging in fictitious securities trading or anything. These were legitimate securities purchased for investors. There was no showing that these were going to end up in his pocket at all. That's just not in the record. Well, but what about the fact that he's taking all the money from this? First of all, it's a nominal trustee in terms of U.S. Bank, and then second of all, he's taking all the proceeds and keeping them. That was her argument. That's not what's in the record. That's not what's in the record at all. And you can look at the record, and I can't cite the pages, but that's not supported by the record. To the extent that the only allegations here were there were some expenses, personal expenses that were arguably improper and that— Well, they were pretty grand, as I remember. No, at most it's $100,000, Your Honor. That's what we're talking about. And Mr. Valdez made a salary of $50,000 a year and maybe had some expenses that the Court would find were perhaps not or could be deemed personal rather than business, but it's a de minimis amount. Let me quickly turn to Pentagon Capital because their way to distinguishing it makes no sense. He's just an innocent investor who's in the crosshairs of the SEC. No, Your Honor, I didn't say he was innocent. He was found to have misrepresented the investment, and he should pay a simple penalty. He took trips to the Bahamas. Entertainment is $4,000 a month, Houston apartment, et cetera. Okay, all told, we're talking about $100,000 in expenses. So you're saying that would be the right penalty amount or whatever this minimum is. That would be a legitimate component piece of the hearing that the Court could find, absolutely. And his salary and any management fees that he received, those could properly be gains, pecuniary gains, but the statute requires assessment of his pecuniary gain. Can I just address the Pentagon Capital case? Because it really is on all fours with this case. In Pentagon Capital, again, an individual and two corporate defendants, the Court said you can't take an aggregate number and impose that as civil liability on the individual, and the District Court had imposed it on all three. So it used the term joint and several. So the SEC said, oh, that doesn't apply here, because here the District Court declined to impose the penalty on the two corporate entities. But that's not the crux of what the Second Circuit found. They said the Second Circuit found that the statute requires an analysis of the pecuniary gain to such defendant. In Pentagon Capital, they were all made jointly and severally liable. But here, effectively, what matters is that Mr. Valdez was made liable for the debts of the entities. Were there any proceeds that Evolution got that they spent on something other than Mr. Valdez? Other than paying back prior investors and other than Mr. Valdez, was there anything Evolution was doing with the money it was getting? Nothing improper, Your Honor. Well, but what I'm trying to get at is you're trying to separate out Valdez from Evolution on your aggregation argument or your joint and several argument, and I'm trying to see how they're separate. It sounds like Evolution is just kind of running Valdez's life or Valdez is using Evolution to run his life, and that sounds like they're not that separate. But, you know, it's not like a piercing the corporate veil situation. These are legitimate investment vehicles holding investor funds, purchasing legitimate bona fide securities, then held at U.S. Bank. The analysis requires a pecuniary gain to him. You can't – the statute is plain on its face as the Second Circuit and the D.C. Circuit found. You need to determine the pecuniary gain to such defendants. And the statute doesn't say to the defendant and entities he – the pecuniary gain to the defendant and entity he controls. The court needs to just look – But can't the pecuniary gain not include stuff that he controls even if it's in someone – what if he put it all in his wife's name, but he's just running the show? That's a finding, in fact, the district court can make. That's his benefit. In fact, if it landed somehow, directly or indirectly, he got a tangible financial benefit, a pecuniary gain, that's fair game. The district court could use that to calculate and impose the penalty. We have no problem with that. But here, these are $3 million. And the SEC said the receiver basically, it's good works, brought this money in. No, all it did was basically hold an auction and sell the securities. The securities were there before the receiver was appointed. Nothing changed. It's just the liquidation. And to pick an arbitrary date and say you only get credit for the money's return to the investors before the receiver is appointed, but the fact that these securities are sitting there, purchased for investors, ultimately would have been sold if Mr. Valdez remained in control and returned to investors, how could that be his pecuniary gain? That's just not fair, and that's not what the statute requires. The statute requires that the court look at how Mr. Valdez benefited. And if he benefited from monies received by the entities that he controlled, that's fair game. The court can use those calculations to impose the penalty. But you can't just do an aggregate. I see a period coming anywhere. There it is. Thank you, Judge. To the period, but I don't think there was going to be one. I think we have your argument, passion and all. Thank you. All right, counsel, we appreciate the briefing on this case and the argument. It will be submitted along with the other cases. That said, this concludes the panel's work for this morning. We'll be in recess until 9 a.m. tomorrow. Thank you.